MONROE, J.
Gustave Schutt and wife sue to recover, for their own account and for the use of their minor son, the sum of $25,-000, as damages resulting from personal injuries sustained by the latter through the alleged negligent management of-one of the defendants’ cars whilst being operated on Texas avenue, in the city of Shreveport. The defendants (two companies) plead the general denial, and allege contributory negligence on the part of the minor. And they have appealed from a verdict and judgment against them in the sum of $21,400. The evidence establishes the following facts, to wit:
That the minor is an intelligent boy, who, at the date of the injury complained of, was in his thirteenth year, and physically active; that he had been employed for six months as a carrier for an evening newspaper, and in the discharge of his duties, at about 5 o’clock on the afternoon of January 31, 1901, rode through Christian street into Texas avenue, and that, in the attempt to cross the avenue, his horse was struck by a northbound car, knocked . or dragged for a few feet, thrown over to the side of the track, and its right hind leg broken, whilst the minor sustained a fracture of the bone of the left thigh, and a severe, incised, or lacerated flesh wound; that Texas avenue runs, approximately, north and south, is 54 feet wide between curbs, and has a double-track railway, operated by electricity, through the center the north-bound cars using the east, and the south-bound cars using the west, track; that Christian street, running slightly northwest and southeast, opens into Texas avenue upon the west side, and there terminates, not having been opened upon the east side; that, upon the northwest corner of the street and avenue, there is an undertaker’s shop fronting on the avenue, and extending back on the street for 100 feet or more; that on the southwest corner is Abrahamson’s store, fronting on the avenue, with a shed over the banquette and extending back on the street; that next to the store, and fronting on the avenue, is Moch’s stable, and next to that the fence and gate of Moch’s wagon yard, the middle of the gate being 129 feet from the center of Christian street; that on the east side of the avenue is Cazaux’s bakery, so situated that if Christian street were extended across, the north side line of the bakery would coincide with a line running-through the center of the street, and the south side line would lie to the south of the south line of the street so extended; that the minor had delivered his last paper at Laplace’s, on Christian street, in the rear of the undertaker’s, and was on his way to deliver the next at the bakery, when the accident happened; and that, when he found himself upon the east track, with the defendants’ car, weighing with its load of passengers, about 15 tons, and moving at the rate of probably 12 miles an hour, within 5 feet of him, he was engaged in rolling the newspaper in order that he might the more conveniently throw it into the bakery, whilst his horse was moving, either at a trot or a gallop, obliquely across the track. Precisely how the boy received the deep cut across the upper third of the left thigh, the horse having been struck on the right hind quarter, is not altogether clear, but, as the horse and rider were thrown barely off the track, and as the car then passed them, it is likely that the injury was inflicted by the step of the car.
Returning to the situation as it existed when he entered the avenue, the boy states in his testimony that he stopped before reaching the west track and looked both ways, that he saw a car on that track, about the wagon yard, going south, and that it did not stop, and that there was no other car in *503 sight When he was called upon by counsel for plaintiffs to be specific as to whether he stopped his horse or merely checked his speed, he said that “he slacked him up.” Aside from this, it is proved by other witnesses, and controverted by none, that the horse either galloped, trotted, or cantered into the avenue, and that his speed, if reduced at all, was not reduced below a trot until he was struck by the car. It is established beyond question that the south-bound car stopped near the wagon yard because the electricity failed, from which it follows that, as it had not been stopped when the boy last saw it, he must have been mistaken as to its position at that time. And there are other reasons which justify this belief, to wit: The conductor was standing upon the rear platform, leaning against the body of the car, with his face to the rear, and he testifies that he saw the boy come into the avenue from Christian street and ride “in a burry” across the west track, just after the car had passed over it, and keep on without stopping until he was struck by the northbound ear on the adjacent track. This testimony is corroborated by that of Jeter, a witness for plaintiffs, who, coming out of Christian street, reached the corner just as the south-bound car passed on the avenue and just as the boy reached the avenue; and by Justice, a witness for the defendants, who was walking along the banquette on the west side of the avenue, south of Moch’s place, and who testifies that the boy passed right behind the south-bound car. Beyond this, it is undisputed that the south-bound car was the only thing which could possibly have prevented the boy from seeing the north-bound car when he looked in that direction, and yet, if the south-bound ear was then 129 feet away, it could not have masked the other car, unless the latter had been four or five hundred feet distant from the point of observation, as may readily be seen by applying a ruler to the sketch of the locus in quo offered on behalf of the plaintiffs, and shown to have been accurately drawn upon a scale of 50 feet to the inch. So that if the southbound car had been at the wagon yard gate when the boy started to cross the avenue, and in that position had masked the approaching north-bound car, he would have had plenty of time within which to cross both the tracks in safety, even though the north-bound car had been traveling at a much higher rate of speed than is claimed by the plaintiffs. There is still another circumstance tending to show that the southbound car could not have reached the wagon yard when the boy started to cross the tracks, viz.: The car stopped at the wagon yard because the motive power was cut off, and the evidence shows that one of the causes which produce that effect is the blowing out of a “block” at the power house, and that the block is likely to be blown out when a motorman upon any car of the line reverses the current of electricity without first cutting it off, as was probably done by the motorman on the north-bound car when he realized that the boy, unconscious of the approach of the car, was about to ride on the track in front of it. If, however, this reversal of the current resulted in cutting off the power from the south-bound car, it is evident that the stopping of that car must have been about coincident in time with the accident, and, as it stopped at the wagon yard, that it could not have reached there when the boy entered the avenue. And finally, upon this point, one of the physicians who attended the boy, and who testified on behalf of the plaintiffs, was asked on cross-examination what the boy said about the accident just after-wards, and, the question having been objected to, he was made a witness for the defendants, and answered by saying: “Why, he said that he was riding out of Christian street into Texas avenue, and that he rode to the rear of the car going up the avenue, and that as he emerged from the rear of the said car he came in contact with the ear that was going down the avenue, or coming down the avenue, and he was knocked from his horse and was dragged for some distance. How far, he did not know.”
Being cross-examined on behalf of the plaintiffs, the witness said:
“I think he made that statement to me while we were preparing for the operation. I am not positive. Either that evening or the next morning, but I think it was during the preparation for the operation that he said he came in contact with the car.”
This testimony is entirely unimpugned and uncriticised, and, with the other testimony and the circumstances mentioned, seems con- *505 elusive to the effect that the boy crossed immediately behind the passing south-bound car, onto the east track, in front of the northbound car; and it can be readily-understood, as his horse was either galloping or trotting, that the north-bound car must have been hidden from his view until he was almost under its wheels, and, for the same reason, that he must have been hidden up to that time from the motorman.
The motorman is a young man, 25 years of age, weighing 170 pounds, and apparently well equipped, physically and mentally, for the discharge of his duties. He had been in the employ of the defendant companies something over three weeks at the date of the accident, one week receiving practical instruction, and two weeks in charge of a car. The duties of the position are easily understood, and the efficiency of a motorman, intelligent enough to understand them, depends upon his physical activity, combined with a practical experience, which, under proper instruction, may be acquired within the time allowed. Taking the situation in the instant case as described by the boy himself and by the witnesses mentioned, the result would not have been different if the motorman had been an accomplished electrician and had been in the business for years, since neither science nor skill, so far as this record shows, will enable a man to stop a car that weighs 15 tons, and is moving at the rate of 12 miles an hour, within the time and space that were afforded him.
There is no doubt that the car was moving rapidly, the more so, perhaps, because from Lawrence street on the south, a distance of over 700 feet, and possibly from a more distant point, there is a slight downward grade. But whilst the witnesses speak of the movement as “fast,” “pretty fast,” “very fast,” etc., and one or two say that it was faster than usual, none of them seem to have considered at the time that it was dangerously fast, or even particularly noticeable, the fact being that the average speed on the road is about 8 miles an hour, and that at times and places it reaches 10 or 12 miles per hour. It is possible that the car in question approached Christian street at even higher speed than that last mentioned, but the testimony, taken as a whole, and notwithstanding the opinion of two of the witnesses, the one that it was moving at the rate of 18, and the other that it was moving at the rate of 25 or 30, does not make it probable that the speed made, much, if at all, exceeded 12, miles an hour. It is said that the corner at which the accident occurred is a busy one, that a great many vehicles and pedestrians, including persons desiring to take passage on the cars, enter the avenue through Christian street, and that the defendants should take those facts into account and regulate the speed of their cars at that point with reference to them. It appears from the evidence that persons entering the avenue at Christian street with the intention of taking the ears into the city must cross over to the east side in order to board them, but it does not appear that there is any reason why other persons or vehicles should cross the track at that point, or that in fact they do cross there any more than at any other point on the road at which there is no regular crossing. Nor does it appear that at 5 o’clock in the afternoon, in January, the tide of passenger travel moves in the direction of the city. And it is shown affirmatively that at the moment of the accident the street was unobstructed by either vehicles or people. That the speed of street cars should be regulated by the conditions existing at particular places is undeniable, but there are other circumstances which are also to be considered. Thus, a street car line may extend through a comparatively unsettled territory, over which it would ordinarily be safe for the cars to run at high speed; but if upon a particular occasion a multitude were to assemble upon the road, the speed should be regulated with reference to that fact. So, upon the other hand, there may be streets and corners through and about which there is a great deal of traffic and travel at certain hours of the day, with but little at other hours, and none at night, andthe ears should be handled withreference to those varying conditions. It is probable, moreover, that the desire to obtain the advantages of rapid transit is the most potent of the influences that have brought about the adoption of electricity as the motive power for street cars, and whilst it is the duty of the courts to hold those by whom the power is used, as it is their duty to hold other persons, accountable for negligence *507 resulting in injury- or loss to others, it does not follow that the mere furnishing of rapid transit is to be considered negligence, since the use of electricity is permitted in order to accomplish that result.
Applying these observations to the facts disclosed in the record, it does not appear that the transit of the car that inflicted the injury was any more rapid than was warranted by the conditions of time, place, and circumstance, and it is manifest that, if it had been much less rapid tlian it was, the accident would have happened nevertheless. It is said that the motorman ought to have seen the boy sooner, and ought more promptly to have begun his attempt to stop the car, and attention is called to the testimony of one witness, an esteemed member of the bar, who occupied a seat in the south-bound car, and w'ho states that, just as the north-bound car passed, the motorman looked in his direction; and to the testimony of another witness, who was riding on the rear platform of the south-bound car, and who states that he saw the boy coming out of Christian street and before he reached the west track, though he was unable to say whether the horse was walking or galloping, and further testifies that his view was obtained by looking through the length of the car and its closed windows. That the motorman glanced at the passing car suggests no negligence. and, as it happens in this case, the fact that he did so increased the probability of his seeing the boy, who was behind it. As to the testimony of the other witnesses, it seems improbable, in view of his position, that he should have seen the boy coming out of Christian street, and moré improbable, having seen him, that he should be unable to say whether his horse was walking or galloping, but assuming that the boy was coming out, as he states, when he saw him, and had still 20 feet or more between him and the west track, what reason would the motorman of the north-bound car approaching on the east track have had, if he had seen him, for supposing that he would continue to ride, without stopping, until he was immediately in front of that car, and only five or ten feet distant? The motorman says that when he first saw the boy the latter was on or near the west track, and that he was galloping his horse; that he, the motorman, hit his gong and reversed his car as quickly as he could, and that the car ran about 35 feet before striking the boy and 30 feet afterwards. This testimony harmonizes with the testimony and the circumstances which have already been referred to, as showing that the boy emerged from the rear end of the passing southbound car, and with the fact, as testified to by the boy, that when he got into the avenue he saw the south-bound car and no other, and that he continued on his way, rolling his newspaper, and without looking any further; for, until the south-bound ear passed, it concealed the approaching northbound car from his view, and equally concealed him from the motorman of that car. The motorman is probably mistaken in saying that his car ran only 65 feet from the time that he began his attempt to stop it, as the testimony of other witnesses justifies the belief that the car stopped 30 or 40 feet beyond the spot where the boy and horse were thrown from the track, and that they were knocked or forced forward some little distance, though not as far as is claimed, before they fell.
These matters are, however, immaterial; the important question being, did the motorman act promptly and intelligently? And this question must be answered in the affirmative. He saw the boy as soon as he could have been expected to do so, and before the boy saw the car. He could not instantly divine the boy’s mental condition, nor could he know instantly that the boy, whilst galloping or trotting his horse towards the track, was engaged in preparing a newspaper so that he could throw it conveniently, but he was not long in reaching the conclusion that the boy was unconscious of the danger ahead of him and he acted accordingly. The evidence shows, that the movements required to cut off and reverse the current and apply the brakes of an electric car consume from three to five seconds. Supposing it to be three seconds, a car moving at the rate of 12 miles an hour will 'travel 54 feet before the stopping power can be applied, and it can be understood that when that power is applied to a car weighing 15 tons, and moving at that speed, the car does not stop instantly, even though the wheels may be locked, or made to revolve in the opposite direction. If, *509 therefore, as it seems to be claimed, the motorman, in this instance, had not begun to apply the stopping power prior to the moment of the accident, the car in all probability would not have been stopped within 100 feet of where the horse was struck, whereas, in point of fact, it was brought to a stand within a little more than half that distance, the witnesses varying considerably on that subject. There are witnesses who say that they did not hear the gong ring, but there are many who testify positively that it did ring, and their testimony is conclusive of that question. The danger attendant upon an attempt to cross a double-track street railway immediately behind a passing car, and without considering that it may conceal from view another car moving in the opposite direction, will be recognized by those who are at all accustomed to street car travel, and it is a danger from which, in the main, each wayfarer must be his own protector, since in such case he appears so suddenly, and the motorman has so little notice of his coming, that the efforts of the latter to avoid a collision are likely to be of little avail. Where a car has stopped on one track for the purpose of letting out passengers, no doubt much may be accomplished by the vigilance of the motorman of the approaching car on the- other track, since he is forewarned by the situation. But where a person emerges rapidly from a side street and crosses immediately behind a passing car, there is nothing to suggest his approach to a motorman on the further track, and the burden of responsibility for a collision rests, for the most part, upon the individual himself. This is true in the present instance.
(Feb. 2, 1903.)
It is therefore ordered, adjudged, and decreed that the verdict and judgment appealed from be annulled, avoided, and reversed, and that the demand of the plaintiffs be rejected at tlieir cost in both courts.
BLANCHARD, X, takes no part.